# In the United States Court of Federal Claims

No. 12-527 C

(Filed January 14, 2015)

```
* * * * * * * * * * * *      *
RQ SQUARED, LLC,            *
                            *      Implied-in-Fact Contract Claim; RCFC
              Plaintiff,    *      12(c); RCFC 56(d).
                            *
         v.                 *
                            *
THE UNITED STATES,          *
                            *
              Defendant.    *
                            *
* * * * * * * * * * * *      *
```

*Paul W. Verner*, New York, NY, for plaintiff.

*Joshua E. Kurland*, with whom were *Joyce R. Branda*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Steven J. Gillingham*, Assistant Director, United States Department of Justice, Washington, D.C., for defendant.

_____

**OPINION**

_____

**BUSH**, *Senior Judge.*

The court has before it defendant's motion for judgment on the pleadings, relying on Rule 12(c) of the Rules of the United States Court of Federal Claims (RCFC), as well as, in the alternative, defendant's motion for summary judgment, relying on RCFC 56. These motions have been fully briefed. Oral argument was neither requested by the parties nor deemed necessary by the court. For the reasons described below, defendant's RCFC 12(c) motion is granted in part and

denied in part, and defendant's RCFC 56 motion is deferred pending limited, targeted discovery.

## BACKGROUND[1]

### I.   Introduction

This a straightforward dispute.  RQ Squared, LLC (RQ2), a technology company, asserts that the United States Postal Service (USPS) entered into negotiations with RQ2 regarding a potential business relationship between the two entities.  According to the complaint, the negotiations faltered and some time later proprietary information belonging to RQ2 – information that had been revealed to USPS – was improperly used by USPS and disclosed to other businesses.  The government contends, on the other hand, that no proprietary RQ2 information was used or disclosed by USPS.  The basic dispute has proceeded, in various forms, in a suit brought in the United States District Court for the Western District of Missouri, and in two suits before this court.

### II.   History of RQ2's "Dual Label System"

RQ2 is based in St. Joseph, Missouri.  Compl. ¶ 1.  The founder and "Member Manager" of RQ2 is Christopher Grubb, who worked as a Senior Account Executive with Nextel Communications, Inc. for about a year before leaving to start RQ2 in 1998.  Grubb Decl. ¶¶ 14, 17-18.  Initially, RQ2 purchased and sold new and used cell phones.  Id. ¶ 18.  "In or around 2001, RQ2 developed a proprietary web-based program and software to enable customers of RQ2's clients to print Federal Express ("FedEx") labels in order to return used, damaged, or defective products [to the seller]."  Compl. ¶ 10.  At the time, RQ2's product return service, as it was originally developed, depended only on the FedEx shipping infrastructure.  Id. ¶¶ 10-12; Grubb Decl. ¶¶ 23, 33, 35.

RQ2's primary client for this service appears to have been Nextel at that

---

[1]/  The facts recounted here are taken from the complaint and other filings submitted by the parties, and appear to be undisputed for the purpose of resolving this court's jurisdiction over plaintiff's claims.  The court makes no findings of fact in this opinion other than for the purpose of determining its jurisdiction over plaintiff's suit.

point in time:

> RQ2 . . . successfully worked with Nextel
> Communications, Inc. ("Nextel") on a web-based
> program used to assist customers in retrieving used,
> damaged or defective cell phones for Nextel.  As a result
> of the project, Nextel realized it would be beneficial to
> find a way to increase the frequency with which an
> individual who used RQ2's web-based application
> actually followed through with the shipping of the
> defective phone, which at the time, required the customer
> to appear physically at a Federal Express box, kiosk or
> depot.  In response, while RQ2 began developing
> additional shipping options for Nextel, it conceived of
> the RQ2 Idea; an idea for dual labels – a label with a bar
> code[] or codes that would allow a package to be
> processed and shipped by both Federal Express and
> USPS, allowing the customer/shipper to choose
> whichever carrier was more convenient and thereby
> increasing the volume and efficiency of the delivery and
> handling of these packages.

Compl. Ex. 1 at 3.

Thus, one innovation in the allegedly proprietary information developed by
RQ2 in 2005 was the dual bar code label:

> In or around June of 2005, RQ2 conceived of the novel
> idea[] of Dual Labels:  a single label with multiple bar
> codes that would allow a package to be processed and
> shipped by either FedEx or USPS.

Compl. ¶ 13.  The other allegedly proprietary material developed by RQ2 at this
time was the technology behind the label, sometimes referred to as the product
return program's "back end," Grubb Decl. ¶ 30, an important component of the
"Dual Label System":

3

> RQ2's proprietary web-based program allowing for
> embedded information in label bar codes and RQ2's
> proprietary logistical and tracking software (collectively
> referred to as the "Dual Label System") were essential to
> the function of the Dual Label.

Compl. ¶ 23; *see* Grubb Decl. ¶ 32 (asserting that RQ2 developed "necessary computer programs, embedded bar codes and simultaneous tracking and billing" for its "Dual Label Dynamic Back End System," a system that was not "in existence anywhere in the industry at the time").

## III.  Postal Service Product Return Programs

The USPS, meanwhile, had been experimenting with product return mailing programs, too, which involved collaboration between USPS and independent delivery companies.  There was, for example, an existing program called Parcel Select, which used a combination of USPS delivery to customers' homes, or customers dropping off packages for return at their local post office, with long-distance transport to or from the seller by a company such as United Parcel Service of America, Inc. (UPS) or FedEx Corporation (FedEx).  Cochrane Decl. ¶ 2; Def.'s Mot. at 3.  To complement this existing system, USPS launched a pilot program called Parcel Return Service in 2003, which later became permanent.  Compl. ¶¶ 24-25; Def.'s Mot. at 3.

The Parcel Return Service (PRS) pilot program defies succinct description, because it involves a number of highly technical specifications for the sharing of tasks between USPS and the PRS provider, as well as various tracking and accounting mechanisms.  A PRS overview is provided in the complaint:

> [I]n an effort to facilitate more efficient package
> handling, the USPS began an experimental program of
> preprinted, prepaid return labels provided to customers
> by merchants so that customers could more efficiently
> ship packages that needed to be returned, repaired,
> recycled, or recalled.

Compl. ¶ 24.  As further explained by defendant, PRS

allows customers to return merchandise to a retailer by simply placing the merchandise back in a package, affixing the label provided by the merchant, and either bringing the package to their local post office for return to the merchant, handing it to a mailperson, or scheduling a home pickup. The customer is not required to pay postage for the return, while the merchant is required to pay certain annual fees to participate in the program, as well as the postage for any packages actually returned to the merchant through the program. In order to be approved to participate in the PRS, merchants or participating service providers need to comply with USPS's detailed specifications, including specifications regarding the return mailing label they would use. A deviation from USPS's specifications requires USPS granting a waiver. The standard label for the PRS program is not a so-called "dual label" because it contains a single USPS bar code and is not intended for use in conjunction with other carriers, such as UPS or Federal Express.

Def.'s Mot. at 3-4 (citations omitted). It appears that only one or two PRS providers participated in the PRS program in the early years. *See* Grubb Decl. ¶ 111; Cochrane Decl. ¶ 10; Def.'s Mot. Ex. 1 Att. A at 2; Pl.'s Opp. at 23. The only PRS provider identified by the parties is a company named Newgistics. Grubb Decl. ¶ 111; Cochrane Decl. ¶ 10; Def.'s Mot. Ex. 1 Att. A at 2; Pl.'s Opp. at 23.

## IV.   RQ2 Attempts to Become a Product Return Service Provider for USPS

There are two versions of the history of negotiations between RQ2 and

USPS regarding a potential business collaboration between the two entities. According to plaintiff, the negotiations began in June of 2005:

> [I]n line with the USPS' concern over increased efficiency in package handling, RQ2 brought its idea for dual labeling to USPS with the express intent of convincing USPS to use the RQ2 Idea so that RQ2 could profit from that use in June of 2005.

Compl. Ex. 1 at 3.  Negotiations continued with increasing interest from USPS. According to plaintiff, USPS's eagerness to close a deal was evidenced by RQ2's participation in a USPS vendor conference; a site visit by USPS officials to RQ2's business location; a number of face-to-face meetings; and exchanges of documents, emails and telephone calls.  *Id.* ¶¶ 27, 31-33, 36, 38, 54-55, 58, 60-61, 65, 67-68.  USPS and RQ2, along with the participation of FedEx, eventually developed a plan and schedule to launch RQ2 as a PRS provider.  *Id.* ¶¶ 65, 67-68. Nonetheless, USPS, perhaps because of a dispute with FedEx, delayed finalization of the launch plan, never approved RQ2's application to become a PRS provider, and eventually stopped answering any communications from RQ2.  *Id.* ¶¶ 69-72.

Defendant does not specifically dispute the facts presented by RQ2 that suggest that negotiations were in progress between USPS and RQ2, or that certain milestones of those negotiations occurred in 2005 and 2006.  Instead, a declaration submitted by James P. Cochrane of USPS notes that Mr. Cochrane was involved in "dealings . . . in connection with RQ Squared's efforts to become a Parcel Return Service provider."  Cochrane Decl. ¶ 3.  In his view, USPS was not interested in any "dual label" idea or system that RQ2 could provide; it was interested in having an additional PRS provider.  *Id.* ¶¶ 4-5.  Thus, the primary difference in the two versions of the negotiations between RQ2 and USPS is that plaintiff asserts that USPS was eager to obtain RQ2's technology, whereas the government's declarant asserts that USPS merely desired another PRS provider to participate in its pilot program.

## V.    Alleged Misuse of RQ2's Proprietary Information

In general, plaintiff asserts that:

> The dual label system was developed solely by RQ2 for
> USPS.  Relying on the understanding that USPS would
> not exploit the RQ2 Idea without compensation to RQ2
> and that USPS would keep confidential the details of the
> RQ2 Idea, RQ2 collaborated with USPS over the course
> of two years to integrate RQ2's concept and launch it
> with USPS and Federal Express.  Without warning, and
> instead of proceeding to launch with RQ2, USPS cut off
> communication with RQ2, misappropriated the RQ2 Idea
> and breached its implied agreement with RQ2 to not
> exploit RQ2's idea without compensation to RQ2 and to
> keep the details of RQ2's idea confidential.

Compl. Ex. 1 at 5.  More specifically, plaintiff points to various markings on
documents related to the PRS application process which identify certain material
as confidential and/or proprietary.  *Id.* ¶¶ 34, 40, 42, 51-52, 66.  Plaintiff asserts
that RQ2 revealed proprietary information to USPS as part of the PRS application
process during 2005-06.  *Id.* ¶¶ 35, 38-39, 41, 43, 53.  Plaintiff further asserts that
these facts show that RQ2 and USPS entered into an implied-in-fact contract to
keep RQ2's proprietary information confidential, and to not use RQ2's
information without compensating RQ2 for its valuable "dual label" trade secret.

The alleged breach of this implied-in-fact contract was manifested in two
ways, according to the complaint.  UPS announced early in 2009 that it would
launch a collaborative product return service with USPS – the "Flexible Access
Program."  Compl. ¶¶ 77-79.  Plaintiff asserts that Flexible Access "replicates
RQ2's Dual Label program."  *Id.* ¶ 79.  Similarly, FedEx launched a collaborative
product return service with USPS later in 2009 called SmartPost, which also,
according to plaintiff, replicates RQ2's Dual Label program.  *Id.* ¶ 82.

These facts, according to the complaint, show that USPS disclosed RQ2's
proprietary information to UPS and FedEx and that USPS did not compensate
RQ2 for its proprietary information.  USPS therefore allegedly breached the
implied-in-fact contract between RQ2 and USPS:

> USPS through its employees disclosed RQ2's proprietary
> Dual Label System, including proprietary programs and

> software, to UPS and FedEx [and] USPS used the
> proprietary RQ2 Dual Label System to develop and
> implement the UPS Flexible Access Program and the
> FedEx SmartPost programs.

Compl. ¶¶ 73-74.  These basic factual allegations have been alleged by RQ2 to
support a variety of legal claims in this court and elsewhere.

## VI.   History of Business Difficulties for RQ2 and Litigation

In late 2006, RQ2, Christopher Grubb, Valerie J. Grubb (RQ2's vice
president, according to an exhibit filed in this case), and RQ2's parent corporation
Reliable Communications, Inc., along with other defendants, were sued in the
United States District Court for the Western District of Missouri for an alleged
failure to make payments on a business loan and related guarantees.  *U.S. Bank
Nat'l Assoc. v. RQ Squared, L.L.C.*, No. 06-6132-CV-FJ-JTM, (W.D. Mo. filed
Nov. 15, 2006).  The district court appointed a receiver to operate RQ2 on
December 22, 2006.  Summary judgment in that case was granted against RQ2,
Mr. Grubb, Valerie Grubb, and Reliable Communications, Inc., in the amount of
$2,199,087.56 on July 19, 2007.  According to the complaint filed in that case,
Reliable Communications, Inc. had let its corporate registry lapse before
November 15, 2006.

In 2010, RQ2 sued the United States in two courts regarding its PRS
application with the USPS, alleging that its proprietary information had been
misappropriated.  In the first suit, which was filed in this court, RQ2 alleged in its
complaint that a taking of its dual label system trade secret had occurred and that it
was owed at least $786,500,000.  *RQ Squared, L.L.C. v. United States*, No. 10-567
(Fed. Cl. filed Aug. 20, 2010).  That case was voluntarily dismissed on March 29,
2011 by the plaintiff.  The second suit was filed in the United States District Court
for the Western District of Missouri on the same facts and alleged that under the
Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680 (2012) (FTCA), the
United States was liable to plaintiff for a breach of fiduciary duty for at least
$786,500,000.  *RQ Squared, L.L.C. v. United States*, No. 10-6108-CV-SJ-JTM,
(W.D. Mo. filed Sept. 10, 2010).  That case was dismissed on March 8, 2011 after
the district court granted the government's motion to dismiss on the grounds that
the FTCA had not waived the United States' sovereign immunity against claims

that relied in any part on alleged government misrepresentations.

Next, on June 21, 2011, RQ2 submitted a claim, on exactly the same facts as in the prior suits, under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109 (2012) (CDA), to a USPS "Field Contracting Officer."  Compl. ¶ 7, Ex. 1.  Plaintiff contests USPS's deemed denial of the CDA claim in the instant suit, through a complaint filed in this court on August 21, 2012.  Accompanying the complaint was the required corporate disclosure statement, also filed August 21, 2012, which stated that  Reliable Communications, Inc. is the sole shareholder of RQ2.  A few days later, on August 29, 2012, the State of Missouri recognized that the corporate registration of Reliable Communications, Inc. had lapsed.[2]  *See* Missouri Online Business Filing, at http://bsd.sos.mo.gov, last visited January 5, 2015.

Once the complaint and answer were filed in this case, but before the parties' Joint Preliminary Status Report was filed, the attorney representing RQ2 requested leave to withdraw, citing nonpayment of fees by RQ2.  *See* Mot. of June 26, 2013.  After much delay, RQ2 obtained new counsel.  *See* Order of March 21, 2014.  Mr. Grubb has alleged that RQ2 has "lost its business entirely."  Grubb Decl. ¶ 108.  After further delays, Defendant's Corrected Motion for Judgment on the Pleadings, or, in the Alternative, for Summary Judgment in Favor of the Government, was submitted and is now fully briefed.  The government's motions will be discussed in detail in the analysis section of this opinion.

## DISCUSSION

## I.    Standard of Review for Judgment on the Pleadings

When this court considers defendant's "motion for judgment on the pleadings, each of the well-pled allegations in the complaint[] is assumed to be correct, and the court must indulge all reasonable inferences in favor of the plaintiff[]."  *Atlas Corp. v. United States*, 895 F.2d 745, 749 (Fed. Cir. 1990) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Owen v. United States*, 851 F.2d 1404, 1407 (Fed. Cir. 1988)).  The court applies substantially the same test as it

---

[2]/  A supplemental filing identifying a change in corporate disclosure information, required by RCFC 7.1(b)(2), appears to be over two years overdue.

does for a motion to dismiss for failure to state a claim under RCFC 12(b)(6).  *See Perez Acevedo v. Rivero Cubano*, 520 F.3d 26, 29 (1st Cir. 2008) ("A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss." (citing *Curran v. Cousins*, 509 F.3d 36, 43-44 (1st Cir. 2007))); *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007) ("The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss.") (citation omitted); *Peterson v. United States*, 68 Fed. Cl. 773, 776 (2005) ("The legal standard applied to evaluate a motion for judgment on the pleadings is the same as that for a motion to dismiss [under RCFC 12(b)(6)]."); *see also Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011) ("When reviewing a decision of the Court of Federal Claims to grant judgment on the pleadings under RCFC 12(c), 'we apply the same standard of review as a case dismissed pursuant to Rule 12(b)(6) . . . .'" (quoting *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009))).

"Factual allegations [in the complaint] must be enough to raise a right to relief above the speculative level . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*Twombly*) (citation omitted).  Plaintiffs must go beyond "a formulaic recitation of the elements of a cause of action."  *Id.* (citation omitted). Further, the court must not mistake legal conclusions presented in a complaint for factual allegations which are entitled to favorable inferences.  *See, e.g.*, *Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[W]e are not bound to accept as true a legal conclusion couched as a factual allegation.") (citations omitted).  Nonetheless, "the court should only grant a defendant's motion for judgment on the pleadings if the defendant is clearly entitled to judgment on the basis of the facts as the plaintiff has presented them."  *Owen*, 851 F.2d at 1407.

The court must inquire whether the complaint meets the plausibility standard described by the United States Supreme Court, *i.e.*, whether it adequately states a claim and provides a "showing [of] any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563 (citations omitted).  "To survive a motion [of this nature], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*Iqbal*) (quoting *Twombly*, 550 U.S. at 570).  Plausibility is a context-specific inquiry. *See, e.g.*, *id.* at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense.") (citation omitted).

After according all reasonable inferences to the factual allegations of the complaint, "[j]udgment on the pleadings . . . is appropriate where there are no material facts in dispute and the [movant] is entitled to judgment as a matter of law." *New Zealand Lamb Co. v. United States*, 40 F.3d 377, 380 (Fed. Cir. 1994) (citation omitted).  A party may present facts outside of the pleadings when bringing or resisting a motion for judgment on the pleadings; upon consideration of these materials the court would then treat the motion as one for summary judgment under RCFC 56.  RCFC 12(d).

## II.    Standard of Review for Summary Judgment

"[S]ummary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotations and citations omitted).  The party moving for summary judgment will prevail "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A genuine issue of material fact is one that could "affect the outcome" of the litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  A summary judgment motion is properly granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial.  *Celotex*, 477 U.S. at 324.

The Supreme Court has instructed that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48.  A non-movant will not defeat a motion for summary judgment "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citation

11

omitted).  "A nonmoving party's failure of proof concerning the existence of an
element essential to its case on which the nonmoving party will bear the burden of
proof at trial necessarily renders all other facts immaterial and entitles the moving
party to summary judgment as a matter of law." *Dairyland*, 16 F.3d at 1202
(citing *Celotex*, 477 U.S. at 323).

## III.    Standard of Review for Requests for Discovery Under RCFC 56(d)[3]

RCFC 56(d) governs discovery afforded to a party opposing a summary
judgment motion:

> *When Facts Are Unavailable to the Nonmovant.*  If a
> nonmovant shows by affidavit or declaration that, for
> specified reasons, it cannot present facts essential to
> justify its opposition, the court may:
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to
> take discovery; or
> (3) issue any other appropriate order.

RCFC 56(d).  The nonmovant will generally be given a chance to conduct
discovery that is reasonably directed to obtaining facts essential to its case.
*Opryland USA Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 852 (Fed. Cir.
1992) (citations omitted); *see Dunkin' Donuts of Am., Inc. v. Metallurgical
Exoproducts Corp.*, 840 F.2d 917, 919 (Fed. Cir. 1988) (vacating a grant of
summary judgment because no opportunity for the discovery of pertinent facts was
afforded the nonmovant).  If a continuance is granted under this rule, the court
must ensure that the nonmovant has "adequate time for discovery." *Dunkin'
Donuts*, 840 F.2d at 919 (citing *Celotex*, 477 U.S. at 322-23).

The opportunity provided by RCFC 56(d) to conduct discovery while
resisting summary judgment is not unlimited, however.  Rule 56(d) "provides for
comparatively limited discovery for the purpose of showing facts sufficient to
withstand a summary judgment motion." *First Nat'l Bank of Ariz. v. Cities Serv.*

---

[3]/  RCFC 56(d) was formerly RCFC 56(f); the language of the former rule was
substantially similar but not identical to RCFC 56(d).

*Co.*, 391 U.S. 253, 265 (1968). The non-moving party will not be allowed to conduct discovery that has no chance of leading to the denial of summary judgment for the movant. *See Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996) (stating that a court may deny a motion for additional discovery if "'there is no reason to believe that [the discovery requested] will lead to the denial of a pending motion for summary judgment'" (citing *Pac. Serv. Stations Co. v. Mobil Oil Corp.*, 689 F.2d 1055, 1066 (Temp. Emer. Ct. App. 1982))). In particular, the court may deny the nonmovant discovery of facts which, because of prior court rulings, could not be of any use in resisting a pending summary judgment motion. *See id.* (citing *Fleetwing Corp. v. Mobil Oil Corp.*, 726 F.2d 768, 771 (Temp. Emer. Ct. App. 1983)); *Wallace v. Brownell Pontiac GMC Co.*, 703 F.2d 525, 528 (11th Cir. 1983) ("It would have been useless to continue discovery because the Fifth Circuit previously had decided the issue in question adversely to the appellants.").

There may be other criteria for ruling on a RCFC 56(d) motion, but precedential caselaw is sparse on this topic. *See Flowers v. United States*, 75 Fed. Cl. 615, 626 (2007) (stating that the Federal Circuit "has not established criteria to consider in evaluating a motion for discovery under RCFC 56([d])" (citing *Theisen Vending Co. v. United States*, 58 Fed. Cl. 194, 198 (2003))). This court interprets RCFC 56(d) liberally, in favor of the party resisting summary judgment. *See, e.g.*, *News Publ'g Co. v. United States*, 218 Ct. Cl. 712, 715 (1978) (citation omitted); *Theisen Vending*, 58 Fed. Cl. at 197 (citation omitted); *Gregory Lumber Co. v. United States*, 9 Cl. Ct. 503, 532 (1986) (stating that "we embrace with approval [t]he requirement of a liberal construction of Rule 56([d])") (citations omitted); *see also Monarch Assurance P.L.C. v. United States*, 244 F.3d 1356, 1364-65 (Fed. Cir. 2001) (sanctioning additional discovery even where "the likelihood that plaintiffs can cobble together enough evidence to persuade the trial court . . . seems quite remote"). One primary question for the court to consider is whether the requested discovery will be necessary or relevant to the nonmovant's opposition to the motion for summary judgment. *See Paalan v. United States*, 57 Fed. Cl. 15, 18 (2003) (requiring that a plaintiff explain how the requested discovery materials "are relevant and necessary to the preparation of his opposition to defendant's motion for summary judgment"). In addition, discovery under this rule should be limited to the legal issues upon which the resolution of a motion for summary judgment will turn. *E.g.*, *Chevron U.S.A. Inc. v. United States*, 72 Fed. Cl. 817, 819 (2006) (stating that discovery under the rule should be

limited to the legal issues presented in the summary judgment motion).

## IV.    Analysis

### A.    RQ2's Claims

The complaint filed in this case contains two closely-related breach of implied-in-fact contract counts.  The first count is labeled breach of a contractual obligation to "not make independent commercial use or unauthorized disclosure of proprietary information submitted to the USPS regarding RQ2's proprietary Dual Label concept."  Compl. ¶ 85.  The second count asserts that USPS misappropriated RQ2's Dual Label trade secret, *id.* ¶ 96, but also relies upon the alleged implied-in-fact contract that USPS would not disclose or make use of RQ2's Dual Label idea, *id.* ¶¶ 93, 96, 98.

As defendant notes, the two counts in the complaint allege breach of an implied-in-fact contract.  Def.'s Mot. at 13 n.3.  The court views the two counts in the complaint as overlapping if not identical.[4]  The court therefore refers to the claim in the complaint as a claim for breach of an implied-in-fact contract between USPS and RQ2.  The nature of the breach is unauthorized disclosure and unauthorized use by USPS of RQ2's proprietary information.

Rather than seek leave to amend the complaint, plaintiff presented an additional, new claim in its opposition brief.  As a general matter, claims raised in responsive briefing do not serve to amend a complaint.  *E.g.*, *Michels v. United States*, 72 Fed. Cl. 426, 432 (2006) (citations omitted).  As such, RQ2's new

---

[4]/  The court notes that plaintiff's opposition brief, too, describes this case as presenting issues of breach of an implied-in-fact contract between RQ2 and USPS.  *See, e.g.*, Pl.'s Opp. at 2-3 (describing, in Statement of the Issues paragraphs 1-3, breaches of a implied-in-fact contract), 10 ("USPS is liable for its breach of implied contract with RQ2 as a result of its conduct . . . manifesting an agreement between USPS and RQ2."), 11 ("Though the misappropriation of trade secrets is often considered to be a tort, USPS here is liable for that claim under the CDA because any obligation of the United States not to misuse any trade secrets arises from the implied contract created as part of the disclosure of the trade secret."), 12 ("[I]t is clear by review of the Plaintiff's Complaint and the Defendant's Answer that RQ2's claim of breach of an implied in fact contract had been adequately pled, that the facts supporting those pleadings have been stated with specificity, and that those facts are not speculative.").

claim, as presented in its opposition brief, is not properly before the court. *Id.*  In the interests of judicial economy, however, the court will address this claim as well as the challenge to this new claim brought by defendant.

Plaintiff alleges in this new claim that the implied-in-fact contract between USPS and RQ2 contains an additional term – that USPS promised to engage RQ2 as a PRS provider. *See* Pl.'s Opp. at 2 (asserting that "RQ2 has pled sufficient non-speculative facts in its Complaint alleging that the United States Postal Service breached an implied contract in fact with RQ2 to approve RQ2 as the third only ever Parcel Return Service provider"), 13 (asserting that "RQ2 not only rightly anticipated, but was absolutely entitled to, earn remuneration for its contractual bargain as the third ever approved USPS PRS vendor"); 22 (asserting that "USPS' conduct clearly manifested an agreement between USPS and RQ2 to develop the RQ2 Dual Label System"), 22 (asserting that "USPS . . . would position RQ2 as the third approved PRS vendor [s]o RQ2 could profit from the RQ2 Dual Label . . . System").  Defendant persuasively argues that the factual allegations in the complaint render this new claim speculative, implausible and untenable.  Def.'s Reply at 2-5.

The facts alleged by plaintiff show that RQ2 had commenced an approval process with USPS which required a final application approval from USPS and which would culminate in an executed service agreement between the two parties. *See* Compl. ¶¶ 67-68.  The new claim presented in plaintiff's opposition brief, that USPS entered into an implied-in-fact contract with RQ2 approving RQ2 as a PRS provider in advance of and in lieu of issuing a final approval and executing a service agreement, is not legally plausible.  *See, e.g.*, *Pac. Gas & Elec. Co. v. United States*, 3 Cl. Ct. 329, 339 (1983) ("[I]n negotiations where the parties contemplate that their contractual relationship would arise by means of a written agreement, no contract can be implied.") (citations omitted), *aff'd*, 738 F.2d 452 (Fed. Cir. 1984).  Under the standard applicable here, *Iqbal*, 556 U.S. at 678, defendant is entitled to judgment on the pleadings regarding any such claim brought by plaintiff, if such a claim could be viewed as properly before the court.

The court now turns to plaintiff's claim regarding USPS's unauthorized disclosure and use of RQ2's proprietary information.

**B.     Materials Outside the Pleadings Must Be Considered to Resolve**

**Defendant's Challenge to RQ2's Breach Claim**

In the court's view, plaintiff's claim as to USPS's unauthorized disclosure and use of RQ2's proprietary information treads the line between plausibility and mere speculation.  Defendant argues, for example, that RQ2's claim as to *breach* of a contractual duty, only *one* of the four required elements of a breach claim, "rest[s] on guesswork wholly unsupported by facts."  Def.'s Mot. at 14.  In essence, defendant asserts that the "replication" of RQ2's Dual Label idea in UPS's Flexible Access and in FedEx's SmartPost is pure speculation.  *Id.*

Plaintiff's opposition brief is not particularly helpful in this regard.  RQ2 relies on general *ipse dixit* pronouncements as to the sufficiency of the factual allegations in the complaint.  *See* Pl.'s Opp. at 2-3 (suggesting that RQ2's "proprietary information was necessary for UPS to implement an exact duplicate of the RQ2 Dual Label System with USPS two years later"), 3 (suggesting that "the United States Postal Service necessarily must have disclosed RQ2's admitted proprietary information and trade secrets to UPS at least"), 17 ("RQ2 argues that the pleadings standing alone, without Defendant having mashed and confused the basis for the Rule 12(c) motion by the Defendant's fact witnesses are sufficient to survive Rule 12(c) scrutiny.").  Plaintiff also relies on exhibits and declarations submitted by the parties, which the court may decline to consider for the resolution of a motion brought under RCFC 12(c).  *See* RCFC 12(d).

The court's analysis is therefore founded, to a large extent, on the complaint and defendant's criticism of the complaint.  According to defendant, plaintiff's breach allegations are not plausible because plaintiff's hypothesis regarding misappropriated proprietary information relies upon a chain of highly speculative events.  Def.'s Reply at 5-6.  The government's arguments are buttressed with citations to Mr. Grubb's declaration, a document not contained within the pleadings.  *See id.* at 6.

Defendant also compares the allegations in RQ2's complaint to the facts alleged in *Twombly*.  Def.'s Reply at 7-9.  However, in the court's view, the facts in this case are quite different from those in *Twombly*.  As the Supreme Court has stated, the inquiry into plausibility is a context-specific inquiry.  *Iqbal*, 556 U.S. at 679.  The facts in *Twombly* are not sufficiently analogous to resolve the RCFC 12(c) motion in this case.

Having duly considered the complaint's factual allegations and the breach claim, and having afforded all favorable inferences to the factual allegations in the complaint, as it must, the court concludes that RQ2's claim is plausible, if only barely so.  To further test RQ2's claim, the court would need to consider materials outside the pleadings.  Because such consideration would bring the court's review outside the ambit of RCFC 12(c), *see* RCFC 12(d), defendant's motion for judgment on the pleadings, except as to judgment on the "new" claim for breach of an implied-in-fact contract to approve RQ2 as a PRS provider, must be denied.

### C.   Summary Judgment Should Be Deferred Pending Limited, Targeted Discovery

The court also has before it defendant's motion for summary judgment, which relies on three declarations as well as exhibits attached thereto.  The court will not recount the specifics of defendant's arguments, but notes that the evidence relied upon by defendant calls into question whether RQ2's Dual Label System was indeed novel, and whether the dual label concept and related technology were already in use in the market by the time RQ2 disclosed its system to USPS.  Def.'s Mot. at 16.  Of particular note is a declaration that avers that UPS already had a like concept and technology before RQ2 is said to have disclosed its system to USPS.  Def.'s Mot. Ex. 3 ¶¶ 10, 12 (Shepherd West Decl.).  None of the evidence submitted by RQ2 thus far is sufficient to create a genuine issue of material fact on this issue.  *See* Def.'s Reply at 13 (discussing the declaration of Mr. Grubb and concluding that "Mr. Grubb effectively does not challenge Ms. Shepherd West's declaration, underscoring that summary judgment is warranted").

Plaintiff argues that summary judgment is not warranted on the record before the court.  Pl.'s Opp. at 28.  The court need not decide the issue at this point, because plaintiff has also requested discovery in order to resist summary judgment.[5]  *Id.* at 4, 14, 17, 28-29.  Plaintiff frames its discovery request broadly:

> Discovery on the several germane questions of fact that
> . . . are now within the exclusive control of USPS, may
> unearth proof and relevant evidence substantiating the

---

[5]/  Had plaintiff not requested discovery, the court notes that the government has set forth a strong argument for summary judgment.

RQ2 circumstantial evidence of multiple contract
breaches.

*Id.* at 29; *see also id.* at 14 ("[I]t is respectfully submitted that Rule 56 decision
should be deferred until further discovery is had on the issues of USPS' handling
of the RQ2 Dual Label System information, the yet unresolved RQ2 PRS
application, the unknown/unstated reasons for USPS termination of all
communications with RQ2 and a host of other germane questions relevant to this
dispute.").

Defendant suggests that discovery would be wasteful and futile. Def.'s
Reply at 15. Although the court concedes that defendant *may* be right, requests
for discovery under RCFC 56(d) are liberally granted. *E.g., Theisen Vending*, 58
Fed. Cl. at 197. Defendant is on firmer ground when the government contends
that plaintiff's broad discovery request indicates that "RQ2 makes clear that it
seeks to engage in a classic fishing expedition through USPS's nationwide
workforce in an attempt to find evidence to support its speculative claims." Def.'s
Reply at 15. The court must agree with defendant that plaintiff's opposition brief
indicates that RQ2 "seeks to pursue discovery on far-ranging and questionable
topics." *Id.*

The proper resolution of plaintiff's broad request for discovery is to
narrowly tailor discovery to the material issue that might prevent summary
judgment for the government. *E.g., Simmons Oil*, 86 F.3d at 1144. In this case,
the dispositive issue accurately highlighted by the government is whether UPS
already possessed the concept and technology for its dual label system that became
Flexible Access, before RQ2 allegedly shared its concept and technology with
USPS. Defendant suggests that, in practical terms, the parties' discovery should
therefore be limited to the relevant factual contentions in the declaration submitted
by Ms. Linda Shepherd West of UPS. *See* Def.'s Mot. Ex. 3. The court agrees.[6]

## CONCLUSION

---

[6]/ At this point in the dispute, the court encourages plaintiff to carefully weigh the costs
of discovery, as well as the costs of opposing a renewed summary judgment motion, against
RQ2's prospects of success on its claim.

For these reasons, it is hereby **ORDERED** that:

(1)    Defendant's Corrected Motion for Judgment on the Pleadings, filed
       June 9, 2014, is **GRANTED in part**, as to plaintiff's contention that
       an implied-in-fact contract to approve RQ2 as a PRS provider was
       formed between plaintiff and the United States, and **DENIED in
       part**, as to plaintiff's contention that an implied-in-fact contract
       concerning the government's disclosure and use of plaintiff's
       proprietary information was breached;

(2)    Defendant's Motion, in the Alternative, for Summary Judgment in
       Favor of the Government, filed June 9, 2014, is **DEFERRED**
       pending targeted discovery limited in scope to the relevant factual
       contentions in the declaration submitted by Ms. Linda Shepherd West
       of UPS; and,

(3)    On or before **February 6, 2015**, the parties shall **FILE** a **Joint
       Proposed Limited Discovery Schedule**.


                                        /s/Lynn J. Bush_____
                                        LYNN J. BUSH
                                        Senior Judge

19